# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | ID No. 1909006286 |
| | ) | |
| ALOK PATEL, | ) | |
| | ) | |
| | ) | |

Decided:  February 26, 2021

## <u>ORDER</u>

*Upon Defendant Alok Patel's Motion in Limine to Exclude Blood Test Results*
**DENIED**.

Jordan A. Braunsberg, Esquire, Department of Justice, Wilmington, Delaware, Attorney for the State of Delaware.

Joseph A. Hurley, Esquire, Law Office of Joseph A. Hurley, Wilmington, Delaware, Attorney for the Defendant.

**SCOTT, J.**

Before the Court is Defendant Alok Patel's ("Mr. Patel") Motion *in Limine* to exclude his blood test results. For the following reasons, Mr. Patel's Motion *in Limine* is **DENIED**.

**Relevant Facts**

On September 11, 2019, an officer of the Newark Police Department, in an incident involving traffic violations, arrested Mr. Patel and alleged he was driving under the influence ("DUI").[1] Following his arrest, the Newark Police Department obtained a blood search warrant.[2] Approximately two hours after Mr. Patel was initially stopped, a phlebotomist from Seascape Health Alliance ("Ms. Allen") procured a sample of Mr. Patel's blood.

On October 27, 2020, after the parties' second Final Case Review, Mr. Patel requested the State to share the instructions that accompany the DSP Blood Kit. On November 2, 2020, the State provided the DSP Blood Kit instructions (the "DSP Instructions") and provided a five-page instruction manual (the "Insert") from the manufacturer of the blood collection tube that is also included in the DSP Blood Kit.[3]

---

[1] State's Answ. to Def.'s Mot. at ¶ 5.
[2] *Id.* at ¶ 6.
[3] *Id.* at ¶ 2.

1

The DSP Instructions state: "[i]mmediately after blood collection, assure proper mixing of anticoagulant/preservative powder by slowly and completely inverting the tube."[4]

The Insert states, in pertinent part, that:

> For proper additive performance, invert BD SST™ Tubes or Plus Serum Tubes 5 times. Invert BD CAT Tubes 5-6 times. Invert BD SST™ II Advance Tubes 6 times. Invert Citrate or CTAD tubes 3-4 times. Invert all other filled additive tubes 8-10 times. [...]. Insufficient mixing or delayed mixing in serum tubes may result in delayed clotting and incorrect test results. **In tubes with anticoagulants, inadequate mixing may result in platelet clumping, clotting and/or incorrect test results.**[5]

Additionally, the Insert provides a laboratory the authority to develop their own collection procedures for the testing instruments:

> Whenever changing any manufacturer's blood collection tube types, size, handling, processing, or storage condition for a particular laboratory assay, **the laboratory personnel should review the tube manufacturer's data and their own data to establish/verify the reference range for a specific instrument/reagent system**. **Based on such information, the laboratory can then decide if a change is appropriate**.[6]

On November 13, 2020, Defendant filed his (1) Motion *in Limine* to Exclude Blood Test Results of Defendant ("Motion") and his (2) Memorandum in Support of *In Limine* Motion to Exclude Blood Test Results ("Memorandum"). On November 30, 2020, the State filed an Answer to Defendant's Motion *in Limine* to Exclude Blood Test Results.

---

[4] *Id.* at ¶ 7.
[5] *Id.*, Ex. B. at p. 4 (Instruction 13) (emphasis added).
[6] *Id.* at p. 4. (emphasis added).

**A. The Defendant**

In his Motion, Defendant argues that "a sufficient foundation will not be presented by the State to permit admissibility of the instructions nor will there be sufficient evidence of appropriate compliance therewith." As a result, through his motion, Defendant moves "to exclude the BAC calculation that was measured after the collection of the Defendant's blood."[7]

In his Memorandum, Defendant clarifies his argument and states that "[h]istorically, upon information and belief, the same manufacturer has required a complete inversion of the collection tube no fewer than five times, post collection, in order to bring into play the forces of gravity to assure proper distributions" and "[t]he version anticipated to be proffered by the State offers no guidance, quantitatively."[8] Moreover, the Defendant argues that "the testimony of the State Chemist that proper distribution can be obtained by whatever method she advocates is not a substitute, since she has no background in calibrating that particular phase of collection albeit much experience in the laboratory analysis of the product, whatever its constitution, that is tested."[9]

---

[7] Def.'s Mot. *in Limine* "to Exclude Blood Test Results of the Defendant" at p. 2.
[8] Def.'s Mem. In Supp. of *In Limine* Motion to Exclude Blood Test Results at p. 2.
[9] *Id.*

As a result, Defendant moves "to exclude the written manufacturer's instruction and/or the ultimate test results based upon a failure to comply with DRE 702 in presenting, by a preponderance of the evidence, the reliable marker to guide the collection process."[10]

Defendant argues that the Insert, not the DSP Instructions, set the foundational requirements for entering Defendant's blood test results ("BAC Results") into evidence. Additionally, Defendant argues that the State Chemist's testimony is not sufficient because she has no background in the collection of blood.[11] As a result, Defendant moves to exclude the Insert and Defendant's BAC Results based on the State's inability to comply with Delaware Rule of Evidence 702 in presenting the State's compliance with collection of Defendant's blood.

### B. The State

The State disagrees that the Insert sets the foundational requirements for entry of Defendant's BAC Results. The State claims that they only need to show compliance with the DSP Instructions.[12] However, even if compliance with the Insert is the proper foundational requirement, the State argues that they have complied with the Insert because the Insert provides authority for a lab to establish its own

---

[10] *Id.* at pp. 2-3.
[11] *Id.* at p. 2.
[12] State's Answ. to Def.'s Mot. at ¶ 12.

protocols.[13] The State asserts that the DSP Instructions are authorized by Julie Willey ("Director Willey"), the Director of the Delaware State Police Crime Lab ("DSPCL").[14] Director Willey's role as Directors of the DSPCL is to "oversee the blood and breath DUI program and to also personally perform headspace gas chromatograph testing," ("HSGC") which includes the testing of the Defendant's blood in the instant matter.[15]

Moreover, the State argues that, even if the preservative failed to mix properly, the failure to properly mix the preservative does not prejudice the Defendant because it would actually lower the final BAC level.[16]

Finally, regarding expert testimony, the State contends that Ms. Allen will testify about the collection process and that she inverted the tube "2-3 times."[17]

## Standard of Review

"A motion in limine typically concerns the admissibility of evidence and is a preliminary motion directed at establishing the 'ground rules applicable at trial.'"[18] "The admissibility of intoxilyzer test results center on the State providing an

---

[13] *Id.*

[14] *Id.* at ¶ 7.

[15] *Id.* (*see* fn. 6).

[16] *Id.* at ¶ 21.

[17] *Id.* at ¶ 6.

[18] *Hercules, Inc. v. AIU Ins. Co.*, 784 A.2d 481, 500 (citing to 3 Moore's Federal Practice § 16.77[4][d] (3d ed.1997)).

5

adequate evidentiary foundation for the test result's admission."[19] Compliance with an intoxilyzer test's instructions or requirements is the guarantee of reliability and accuracy that is the foundational cornerstone to the admissibility of the results of a blood test.[20]

Delaware Rule of Evidence 702 ("D.R.E. 702") governs the admissibility of expert testimony and provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) The testimony is based upon sufficient facts or data;
> (c) The testimony is the product of reliable principles and methods; and
> (d) The expert has reliably applied the principles and methods to the facts of the case.[21]

The Delaware Supreme Court created a five-prong test in determining the admissibility of scientific or technical expert's testimony.[22] Therefore, this Court must also determine whether:

> 1. The witness is qualified;[23]
> 2. The evidence is otherwise admissible, relevant, and reliable;[24]

---

[19] *Clawson v. State*, 867 A.2d 187, 192-93 (Del. 2005).

[20] *Hunter v. State,* 55 A.3d 360, 364-66; *see also Clawson*, 867 A.2d at 191 (Del. 2005).

[21] D.R.E. 702.

[22] *Williams v. Desperito*, 2011 WL 7452803, at *3 (Del. Super. Ct. Oct. 24, 2011) (citing *Bowen v. E.I. DuPont de Nemours & Co., Inc.*, 906 A.2d 787, 795 (Del. 2006); *Tolson v. State*, 900 A.2d 639, 645 (Del. 2006)).

[23] *See* D.R.E. 702.

[24] *See* D.R.E. 401; D.R.E. 402.

3. The bases for the opinion are those reasonably relied upon by experts in the field;[25]
4. The specialized knowledge being offered will assist the trier of fact to understand the evidence or determine a fact in issue;[26] and
5. The evidence does not create unfair prejudice, confuse the issues, or mislead the jury.[27]

"[T]he proponent of the proffered expert testimony bears the burden of establishing the relevance, reliability, and admissibility by a preponderance of the evidence."[28] However, the proponent must only demonstrate that the expert's opinions are reliable.[29] Thus, where an expert's opinion is challenged, "the trial judge must decide if the expert's testimony 'has a reliable basis in the knowledge and experience of the relevant discipline.'"[30]

## Discussion

### A. Superior Court's Review for Admission of BAC Results into Evidence

When faced with whether to admit into evidence BAC Results, the Court first inquires into whether the instructions for that particular test were complied with.[31] The Court should admit the evidence so long as the State provides a reasonable basis

---

[25] *See* D.R.E. 703.
[26] *See* D.R.E. 702.
[27] *See* D.R.E. 403
[28] *Minner v. Am. Mortg. & Guar. Co.*, 791 A.2d 826, 843 (Del. Super. Ct. 2000).
[29] *Williams*, 2011 WL 7452803, at *3 (citing *In re Asbestos Litig.*, 911 A.2d 1176, 1201 (Del. Super. 2006)).
[30] *M.G. Bancorporation*, 737 A.2d at 521 (citing *Kumho*, 526 U.S. at 138 (quoting *Daubert*, 509 U.S. at 592)).
[31] *Clawson*, 867 A.2d at 192-93 (Del. 2005).

7

for the Court to find that the instructions were followed.[32] If the State does so, then the burden shifts to the defendant to show that the instructions were not actually followed or otherwise rendered the results scientifically inaccurate and unreliable.[33]

If the instructions were not followed, established either through expert statements[34] or witness testimony,[35] or are otherwise somehow inaccurate and unreliable,[36] then the Court must exclude the BAC Results.

### a. Foundational Requirements: DSP Instructions vs. Insert

The parties fight over which instructions to apply and whether the State has complied with the relevant instructions. Here, the Insert provides a laboratory the authority to develop their own collection procedures for the testing instruments.

> Whenever changing any manufacturer's blood collection tube types, size, handling, processing, or storage condition for a particular laboratory assay, **the laboratory personnel should review the tube manufacturer's data and their own data to establish/verify the reference range for a specific instrument/reagent system**. **Based on such information, the laboratory can then decide if a change is appropriate**.[37]

As this Court stated in *Fountain*, this language "anticipates end users developing their own instructions and protocol."[38] Under this authority, the DSPCL

---

[32] *Ayala*, 204 A.3d at 835-36 (Del. 2019).

[33] *Hunter*, 55 A.3d at 366 (Del. 2012).

[34] *Fountain*, 2016 WL 4542741, at *5 (Del. Super. 2016).

[35] *Hunter*, 55 A.3d at 35-36 (Del. 2012).

[36] *Id.*

[37] State's Answ., Ex. B. at p. 4. (emphasis added).

[38] *Fountain*, 2016 WL 4542741, at *5 (Del. Super. 2016).

8

established a collection and testing procedure: the DSP Instructions.[39] As a result, the State is required to show compliance with the DSP Instructions.

### b. *The State's Duty under the DSP Instructions*

The DSP Instructions require the blood drawer to, "[i]mmediately after blood collection, assure proper mixing of anticoagulant/preservative powder by slowly and completely inverting the tube."

According to the State, Ms. Allen will testify that she inverts the blood tubes to ensure the additive powders mix into the blood samples and she inverts the bloods tubes roughly 2-3 times.[40] This conduct is consistent with the instructions.

## B. *The Issue Concerning Inversion Requirements*

Defendant argues that "the testimony of the State Chemist that proper distribution can be obtained by whatever method she advocates is not a substitute, since she has no background in calibrating that particular phase of collection albeit much experience in the laboratory analysis of the product, whatever its constitution, that is tested."[41] By distribution, the Defendant refers to the mixture of blood and additive powders in the blood tube contained within the DSP Blood Kit.

---

[39] In *Fountain*, the Court noted that Director Willey stated that she did not create the instructions, but rather someone had done so before she joined the DSPCL.
[40] State's Answ. at ¶ 6.
[41] *Id.*

Based on this Court's experience with the same prosecutor and defense counsel as in *State v. Dyron Green*, the Defendant is challenging Director Willey's authority to change the DSP instructions. In *Dyron Green,* Director Willey stated that the instructions had required, pre-2014, the tube to be inverted five times.[42] However, after concluding that there was no documentation that verified the inversion requirement of five times,[43] Director Willey stated that she removed this requirement and instead required the phlebotomist to "[i]mmediately after collection, assure proper mixing of anticoagulant/preservative powder by slowly and completely inverting the tube."[44]

The issue before the Court is better summarized as whether Director Willey possessed the authority to change the DSP Instructions and whether the additive powders were mixed sufficiently here to provide a reliable sample. For the reasons that follow, Director Willey had the requisite authority, knowledge, and experience to change the DSP Instructions.

### a. Director Willey's Authority

Director Willey, the Director of the DSPCL, "oversees the blood and breath DUI program and [] also personally perform[s] headspace gas chromatograph

---

[42] *State v. Dyron Green*, I.D. 1804014579, July 9, 2019 Trial Tr. at p. 120 (lns. 18-19).
[43] *Id.* at p. 129, lns. 11-13.
[44] State's Answ. at ¶ 7.

testing[.]"[45] According to the State, Director Willey has authorized the use of the DSP Instructions,[46] which informs phlebotomists, like Ms. Allen here, as to the specific requirements of an individual's blood draw. Director Willey, having the responsibility and oversight over the blood and breath DUI program in Delaware, is authorized to make changes to the blood and breath DUI program – which includes changes to established protocols in collecting blood samples. Thus, there is no dispute that Director Willey had the authority to change the DSP Instructions.

### b. Reliable Sample

The issue of whether Mr. Patel's sample was collected and processed in a manner that produced a reliable and accurate test result is at issue here.

### i. Proposed Testimony

Director Willey will testify as to the reliability of the collection procedures and Defendant's sample at trial. According to the State, Director Willey will testify that: (1) the failure to mix the additive powders properly will result in the blood sample coagulating; (2) coagulated blood cannot be tested via the HSGC test; (3) a visual inspection of a blood sample would reveal whether the blood sample was coagulated; (4) DSPCL inspects all blood samples for coagulation and for any other irregularities, such as odor or discoloration, prior to any testing; (5) she personally

---

[45] *Id.* at p. 4 (fn. 6).
[46] *Id.* at ¶ 7.

inspected Defendant's blood sample and determined that no coagulation occurred; (6) the HSGC test results indicated a blood alcohol content of .16; and (7) prior scientific evidence from the past three decades conclude that the presence or absence of a preservative does not impact the integrity of the blood sample relative to its alcohol content.[47] In light of Defendant's arguments here, and as she did in *Green*, Director Willey will likely also testify that (8) there is no requirement that the blood tube must be inverted a specific number of times to ensure a reliable sample.

### ii. *Delaware Supreme Court's Five Factor Test*[48]

The Court, in determining the admissibility of scientific or technical expert testimony, must analyze whether:

> 1. The witness is qualified;
> 2. The evidence is otherwise admissible, relevant, and reliable;
> 3. The bases for the opinion are those reasonably relied upon by experts in the field;
> 4. The specialized knowledge being offered will assist the trier of fact to understand the evidence or determine a fact in issue; and
> 5. The evidence does not create unfair prejudice, confuse the issues, or mislead the jury.

On the first day of trial in *State v. Dyron Green*, Director Willey stated that: (1) she has been employed at the DSPCL for the last twenty-seven (27) years;[49] (2)

---

[47] State's Answ. at ¶¶ 8-10.

[48] *Williams v. Desperito*, 2011 WL 7452803, at *3 (Del. Super. Ct. Oct. 24, 2011) (citing *Bowen v. E.I. DuPont de Nemours & Co., Inc.*, 906 A.2d 787, 795 (Del. 2006); *Tolson v. State*, 900 A.2d 639, 645 (Del. 2006)).

[49] *State v. Dyron Green*, July 9, 2019 Trial Tr. at p. 91 (ln. 10). This statement was made in 2019. Since it is now 2021, it can be assumed that Director Willey has been employed at DSPCL for roughly 28-29 years.

among other responsibilities, she "analyzes alcohol or blood alcohols for cases from within New Castle County;"[50] (3) she holds a Bachelor of Science degree in genetic engineering, a second Bachelor of Science degree in biology, and a minor degree in chemistry;[51] (4) she has completed additional on-the-job courses that she had the opportunity to attend through her employment in forensics with the State of Delaware;[52] and (5) she has analyzed blood samples for the past eleven (11) years.[53] Director Willey is qualified as an expert concerning blood alcohol analysis, in both collection and testing, by knowledge, skill, experience, training, and education.[54]

All of the statements above involve Director Willey's personal experience in testing Defendant's blood sample here or are otherwise based on both her extensive education and professional experience in performing HSGC testing. These statements are relevant, reliable, and helpful to the jury in understanding the facts in this case. Also, these statements would not create unfair prejudice to the Defendant, or otherwise confuse or mislead the jury. These statements would also be helpful in resolving, in light of Defendant's issue concerning whether the blood tube was inverted adequately to prevent coagulation, whether Defendant's sample was

---

[50] *Id.* (lns. 13-19).
[51] *Id.* at p. 92 (lns. 1-3).
[52] *Id.* (lns. 4-6).
[53] *Id.* (lns. 14-15).
[54] *Bowen v. E.I. DuPont de Nemours & Co., Inc.*, 906 A.2d 787, 795 (Del.2006); *Tolson v. State*, 900 A.2d 639, 645 (Del.2006).

13

adequately mixed and thus whether the Defendant's HSGC test was conducted properly.

There is no evidence that there is a minimum number of inversions required to ensure an adequate mixture of the additive powders with the blood sample. Mr. Patel has not proffered any evidence to support his contention. Director Willey has previously stated there is no scientific evidence that a tube must be turned a specific number of times to ensure mixture.[55] The State supplies scientific studies in their Answer;[56] however, those "studies do not proscribe a specified number of inversions and instead focus on the presence of absence of the preservatives."[57]

Notably, the studies are relevant here. This body of scientific literature demonstrates that the presence or absence of preservatives in blood alcohol specimens either does not affect blood alcohol content or shows a slight decrease over time.

The literature is persuasive as it shows that the absence of the preservative would cause the BAC level in any given blood sample to either remain the same or decrease over time. Most relevant here is, attached as State's Exhibit G, the *Inferences and Legal Considerations Following a Blood Collection Tube Recall* (the

---

[55] *State v. Dyron Green*, July 9, 2019 Trial Tr. at p. 129 (lns. 11-13).
[56] *See* State's Answ., Ex. A-G.
[57] State's Answ. at ¶ 21.

14

"2020 Study").[59] The 2020 Study addressed the impact of a 2019 recall of BD Collection Tubes, the same tubes used here, used in criminal prosecutions because they did not contain preservatives or anticoagulant powder. After a review of historical scientific studies on the subject, some of which is provided by the State, the 2020 Study concluded that the "possibility of reporting falsely high blood ethanol concentrations in gray-top tubes without anticoagulant and preservative is overwhelmingly low when samples are taken from living persons."[60] Moreover, that study also determined that, in the absence of a preservative, "[c]oncentrations of ethanol, and many other drugs, actually decrease during storage."[61]

The 2020 Study provides persuasive scientific evidence that the absence of a preservative or anticoagulant in a given blood sample has little effect on the outcome of the BAC level.

The relevant inquiry here is whether the sample is reliable. This inquiry is resolved if it is determined that the sample is adequately mixed. The number of inversions, as stated above, is not relevant here.

---

[59] State's Answ., Ex. G.
[60] *Id.* at p. 3.
[61] *Id.*

## Conclusion

Director Willey is qualified in blood collection and testing, and therefore is the proper person to authorize changes to the State's collection procedures, the DSP Instructions, in accordance with the Insert. For the reasons stated above, Mr. Patel's Motion *in Limine* is **DENIED**.


**IT IS SO ORDERED.**

_____
**Judge Calvin L. Scott**