# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

EBONY WRIGHT, Individually and
as Parent and Next of Friend of
JWR, a Minor,

    Plaintiffs,

  v.

CHRISTIANA CARE HEALTH
SERVICES, INC.,
d/b/a CHRISTIANA CARE
CHRISTIANA HOSPITAL, *et al.*,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No.: N23C-02-206 FJJ

TRIAL BY A JURY OF
TWELVE DEMANDED

Submitted: April 16, 2025
Decided: April 22, 2025

**OPINION AND ORDER**
*On the Parties' Motions in Limine* and *Daubert* Challenge

*Donald L. Gouge, Jr., Esquire*, Donald L. Gouge, Jr., LLC, Wilmington, Delaware, and *Brian M. Cathell, Esquire (Pro Hac Vice)*, Wais, Vogelstein, Forman, Koch & Norman, LLC, Baltimore, Maryland *Attorneys for Plaintiffs.*

*Collen D. Shields, Esquire,* and *Randall S. MacTough, Esquire*, Eckert Seamans Cherin & Mellott, LLC, Wilmington, Delaware, *Attorneys for Defendants*

**Jones, J.**

## INTRODUCTION

This is a medical negligence case arising from the premature birth of J.W.R. Trial is set to start on May 12, 2025. The parties have filed various motions. This is the Court's decision on these motions.

## PLAINTIFFS' MOTIONS

## PLAINTIFFS' PROGESTERONE USE

Plaintiffs seek exclusion of reference to Ms. Wright's progesterone use, specifically her brief cessation of use around December 7, 2017.[1] Plaintiffs argue "any reference or suggestion that Ms. Wright's alleged brief discontinuation of progesterone contributed to or caused the premature birth of JWR lacks evidentiary support from expert opinion and would mislead the jury and unfairly prejudice the Plaintiffs."[2]

Defendants respond agreeing that "no expert will testify that Ms. Wright's discontinuance of progesterone contributed to or caused J.W.R's premature birth."[3] Thus, Plaintiffs argument on that concern is now immaterial. Defendants further argue Ms. Wright's noncompliance with her doctor's order concerning her progesterone use is relevant to impeachment. Defendants maintain that this testimony undermines Plaintiffs' testimony that Ms. Wright would have followed

---

[1] Docket Item ("D.I.") 129 ¶ 2.
[2] *Id.* ¶ 7.
[3] D.I. 133 ¶ 3.

her doctor's advice if a cerclage had been recommended.

Jurors must be allowed the opportunity to hear impeaching evidence that may impact a witness's credibility.[4] Therefore, this Court agrees with Defendants and finds Ms. Wright's progesterone use is admissible impeachment evidence if Ms. Wright testifies that she would have complied with doctor's orders and recommendations.

For these reasons, Plaintiff's Motion is **DENIED**.

## TOPS TRIAL CONSENT FORM

Plaintiffs ask the Court to preclude use of Ms. Wright's consent form for the TOPS clinical trial.[5] Dr. Ruhstaller was the supervising physician of this trial which "investigat[ed] the use of a pessary for the prevention of preterm birth in women with a shortened cervix."[6] Plaintiffs make this argument notwithstanding that in the Pretrial Stipulation an issue of fact identified is "whether Ebony Wright was properly enrolled in the TOPS clinical trial and whether her participation was informed and voluntary."[7] Plaintiffs argue admittance of the consent form is far too prejudicial and would confuse and mislead the jury into thinking that by signing the clinical trial

---

[4] *Jackson v. State*, 770 A.2d 506, 515 (Del. 2001).
[5] D.I. 127.
[6] *Id.* ¶ 2-3.
[7] *See* D.I. 144 Joint Pretrial Stipulations.

consent form, Ms. Wright had informed consent pertaining to cerclage placement.[8] Defendants respond arguing that the consent form is relevant and not confusing nor misleading to a jury because they can understand the plain language of the consent form.[9]

The Court finds that the consent form is relevant and will not lead to confusion on the part of the jury nor does it impact the other factors under D.R.E. 403. Plaintiffs' Motion is **DENIED.**

## REFERENCE TO *NEWSOME*

Plaintiffs seek exclusion of reference to the Circuit Court for Baltimore City, Maryland case, *Newsome v. University of Maryland Medical Center*.[10] One of Plaintiffs' maternal-fetal medicine specialist experts, Dr. John Elliot, gave opinion testimony in *Newsome* that "Defendants negligently breached a standard of care *requiring* Defendant physicians to offer, recommend, and place a cerclage in Plaintiff's twin pregnancy in 2018."[11] The *Newsome* Court deemed Dr. Elliot's opinion testimony to this point inadmissible because an "insufficient factual basis exists for the opinion," and found that medical literature, guidelines, and studies came to the opposite conclusion that a cerclage was not mandated in a twin

---

[8] *Id.* ¶ 10.
[9] D.I. 132.
[10] D.I. 130, Exhibit ("Ex.") C, Case No. 24-C-23-003991.
[11] *Id.* Ex. C p. 9.

gestation.[12]  This opinion is currently on appeal.

Plaintiffs argue *Newsome* is irrelevant and allowing reference to it is prejudicial and confusing to the jury, especially if used to impeach Dr. Elliot because the factual circumstances differ.  Plaintiffs point out that a twin gestation is at issue in *Newsome*, whereas, here, Ms. Wright had a singleton pregnancy when pregnant with J.W.R. [13]

Defendants contend *Newsome* has a "highly probative value" to the instant case to impeach the opinion testimony of Dr. Elliot.[14]  Defendants argue distinctions between *Newsome* and this case are immaterial because Dr. Elliot is providing the same ultimate conclusion "in contradiction to professional society guidelines and scientific evidence."[15]

The issue in *Newsome* involved twins, while the instant case involves a singleton birth.  All agree that this is a critical distinction as to the standard of care.  The distinct factual differences between the cases, along with the fact that *Newsome* has been appealed, leads this Court to conclude that no mention should be made of the *Newsome* decision in this case.  Its probative value is far outweighed by its prejudice.  Furthermore, its admission would confuse the jury.

---

[12] D.I. 131, Ex. F.
[13] D.I. 130 ¶ 12.
[14] D.I. 131 p. 4.
[15] *Id.* p. 6.

5

For these reasons, the Court **GRANTS** Plaintiff's Motion to Exclude reference to *Newsome*.

## COLLATERAL SOURCE EVIDENCE

Plaintiffs ask the Court to bar admission of all collateral source evidence except for the exception of public collateral compensation or benefits carved out in 18 *Del C.* § 6862.[16] Further, Plaintiffs contend they have a right to argue at trial Plaintiffs' future public compensation or benefits is uncertain because it is contingent on Plaintiffs' income, residency, and other benefits.[17]

Defendants oppose Plaintiffs' Motion to the extent it asks the Court to exclude public collateral source evidence admissible under the Delaware Code and case law.[18] Defendants further argue, even though Plaintiffs withdrew their claim for past medical expenses, J.W.R.'s prior Medicaid eligibility since birth is relevant to J.W.R.'s continued eligibility in the future.[19] Finally, Defendants direct the Court to an email exchange between parties in which Defendants sought clarification on the relief Plaintiffs sought in their Motion. Plaintiffs stated in their email response that they "may move to exclude or limit the testimony of [Defendants'] damages experts to the extent their opinions do not comply with the rules of evidence and 18 *Del. C.*

---

[16] D.I. 126 ¶ 9.
[17] *Id.*
[18] D.I. 141 ¶ 5.
[19] *Id.*

§ 6862."[20] Defendants contend, in accordance with the Trial Scheduling Order, it is too late for Plaintiffs to exclude or limit Defendants' experts opinions or introduce undisclosed rebuttal expert evidence.[21]

Under Delaware's collateral source rule, "a tortfeasor has no right to any mitigation of damages because of payments or compensation received by the injured person from an independent source."[22] Thus, "the rule 'prohibits the admission of evidence of an injured party receiving compensation or payment for tort-related injuries from a source other than the tortfeasor.'"[23] The Delaware Code provides an exception to the collateral source rule in medical negligence cases. The rule allows admission of "any and all facts available as to any public collateral source of compensation or benefits payable to the person seeking such damage (including sums which will probably be paid payable to such person in the future) . . ."[24]

The Court finds that, pursuant to 18 *Del. C.* § 6862, Plaintiffs' public collateral sources are **ADMISSIBLE**, and, in accordance with the collateral source rule, any other sources are **INADMISSIBLE**.

---

[20] *Id.* ¶ 4; *see Id.* Exhibit ("Ex.") A.
[21] *Id.* ¶ 6.
[22] *Miller v. State Farm Mut. Auto. Ins. Co.*, 993 A.2d 1049, 1052 (Del. 2010) (quoting *Yarrington v. Thornburg*, 205 A.2d 1, 2 (Del. 1964)).
[23] *Miller*, 993 A.2d at 1053 (quoting *James v. Glazer*, 570 A.2d 1150, 1155 (Del. 1990)).
[24] 18 *Del. C.* § 6862.

## RESIDENCE OF PLAINTIFFS OR PLAINTIFFS' ATTORNEYS

Plaintiffs ask the Court to exclude reference to the residence of Plaintiffs or Plaintiffs' attorneys.[25] Plaintiffs' main concern is that Defendants will utilize this information to paint the image to jurors that Plaintiffs and their attorneys are "outsiders" and "not entitled to the same consideration as local parties." Plaintiffs argue this information is irrelevant and, even if found to be relevant, still prejudicial, misleading, and confusing to the jury.[26]

Defendants respond that they "generally do not oppose Plaintiffs' request to preclude references, arguments, or evidence" concerning the residency of Plaintiffs' attorneys.[27] However, Defendants argue Plaintiffs' residency is a material fact as to damages.[28] First, Defendants contend it is relevant to their public collateral source argument concerning past and future Medicaid benefits from Pennsylvania Department of Human Services and to future care costs related to J.W.R.'s life care plan in Pennsylvania.[29] Second, Defendants argue they can use Plaintiffs' residence to impeach the credibility of Plaintiffs' expert, Mr. McCord, to question why he did not conduct a more particularized analysis and consider data specific to the

---

[25] D.I. 128.
[26] *Id.* ¶¶ 3, 5-8.
[27] D.I. 138 ¶ 2.
[28] *Id.* ¶ 3.
[29] *Id.* ¶ 5-7.

Philadelphia area to calculate J.W.R.'s potential education attainment.[30]

The residence of Plaintiffs' attorneys is irrelevant and excluded. However, Plaintiffs' residence is relevant for the reasons advanced by Defendants. Therefore, the Court **GRANTS** the Motion as to the residences of Plaintiffs' counsel and **DENIES** the Motion as to Plaintiffs' residence.

<u>**DEFENDANTS' MOTIONS**</u>

**MINOR JWR'S LOST EARNING CAPACITY**

Plaintiffs have produced a vocational expert, J. Michael McCord, who provided a report that projects a loss of earning claim for J.W.R. Defendants, citing the Court to the seminal decision in *Henne v. Balick*[31], move the Court to exclude the future lost earning capacity claim. Defendants argue that any future loss of earning capacity is based on pure speculation and is, therefore, not admissible.[32]

In *Henne*, the Delaware Supreme Court held that it was reversible error to permit a law student with no prior work history to recover future lost earnings because there was no evidence of his earnings or as to the extent of the impairment of his earnings in the future. The *Henne* Court concluded that the evidence was simply too speculative to allow for the recovery of future lost earnings and the

---

[30] *Id.* ¶ 8.
[31] 146 A.2d 394 (Del. 1958).
[32] D.I. 124.

9

damages associated with such a claim.

Plaintiffs cite to *Jardel Co., Inc. v. Hughes*[33] in support of its position that this Court should allow the claim. *Jardel* involved a high school student recovering the future earnings of a nurse because she expressed an interest in nursing and enrolled in a college nursing program. In *Kemp v. Christiana Care Health Services, Inc.*[34], this Court allowed a forklift operator to pursue future earnings because there was evidence that he was permanently foreclosed from returning to his chosen profession. In both *Jardel* and *Kemp*, there was some evidence and history to support the claim.

This case involves a baby which means there is no work history. McCord based his opinion on the PEEDS-RAPEL method which examines a number of facts to predict educational attainment of a child. While other states appear to have allowed such testimony[35], this Court must follow the Delaware law clearly articulated in the *Henne* decision. While *Henne* is dated, it is still the law. On the basis of *Henne*, this Court concludes that Delaware law does not recognize a claim for future lost earning capacity and related damages where the injured plaintiff is a baby as the claim is inherently speculative.

---

[33] 523 A.2d 518 (Del. 1987).
[34] 2011 WL 2623940, at *5 (Del. Super. June 27, 2011).
[35] *Greer v. Bryant, et. al.*, 621 A.2d 999 (Pa. Super. Ct. 1983); *see also Lewin Realty III, Inc v. Brooks*, 771 A.2d 446 (Md. Ct. Spec. App. 2001) and cases cited therein.

Defendants' motion to exclude evidence of JWR's lost earning capacity claim is **GRANTED**.

## IRRELEVANT EVIDENCE

Defendants have moved to exclude any evidence or arguments related to (1) Plaintiff Ebony Wright's race; and (2) post-treatment standards and developments arguing that such testimony is irrelevant, and, even if relevant, its probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, wasting time or needlessly presenting cumulative evidence.[36]

Ebony Wright's race is admissible. The record is clear that African American women are at higher risk for cervical insufficiency. Race is a factor in explaining how Ms. Wright's personal risk factors differed from the broader population addressed by general ACOG Practice Bulletins at the time of treatment. Providers have to take into account risk factors to avoid preterm birth. Therefore, the fact that Ms. Wright is African American is relevant. Defendants' motion on this point is **DENIED**.

The issue in this case is whether the Defendants breached the standard of care that was in effect in November and December of 2017. The record suggests

---

[36] D.I. 123.

that the standard of care changed after 2017. Any evidence that the standard of care changed after 2017 is not relevant to the issues in this case. Even if there was some relevance to the change in the standard of care, the probative value of that evidence is substantially outweighed by the danger of unfair prejudice to the Defendants. Additionally, evidence of the standard of care after 2017 could mislead and confuse the jury. Defendants' motion on this point is **GRANTED**.

## THEORY THAT A CERCLAGE WOULD HAVE PREVENTED AN ASCENDING INFECTION

Defendants seek exclusion of Plaintiffs' theory that Ms. Wright's ascending infection would not have occurred had a cerclage been recommended and placed.[37] Defendants argue Plaintiffs' theory is unreliable because Plaintiffs did not, and cannot, rule out that the infection caused Ms. Wright's preterm premature rupture of the membrane ("PPROM"), despite medical literature and Plaintiffs' experts acknowledging a causal connection between the two.[38] Defendants support this contention with the argument that the timing of the infection's initial occurrence is unknown because Ms. Wright lacked clinical signs of an infection and the placental pathology only provides the information that the infection "must have existed at least

---

[37] D.I. 122.
[38] *Id.* ¶¶ 4, 7.

12

48 hours" prior to the time the pathology was taken.[39] Defendants also contend Plaintiffs failed to raise expert opinions "that a cerclage would have prevented PPROM and/or the infection, or that the infection developed after PPROM" in the Designation and did not bring them up until deposition. Thus, Defendants ask the Court to exclude the opinions on that basis alone.[40]

Plaintiffs respond by arguing their theory of causation is not that the "infection itself directly caused J.W.R.'s injuries," but that the infection "was a foreseeable and preventable complication of cervical insufficiency and that the failure to place a cerclage allowed that infection to occur."[41] Their theory does not rely on whether the infection caused PPROM or occurred after the fact because Plaintiffs' experts conclude that the cerclage would have prevented the infection entirely.[42] Plaintiffs state that it is their experts' opinion when it comes to the "limited issue of infection . . . the failure to place a cerclage caused the infection."[43] Plaintiffs argue medical literature and both parties' experts support this opinion.[44] Plaintiffs address Defendants' timely disclosure concern and represent all opinions were disclosed during discovery.[45] Finally, Plaintiffs argue their experts conducted thorough and

---

[39] *Id.* ¶ 7.
[40] *Id.*
[41] D.I. 140 ¶ 4.
[42] *Id.* ¶ 12.
[43] *Id.* ¶ 6.
[44] *Id.* ¶¶ 7-10.
[45] *Id.* ¶ 8.

13

adequate differential diagnosis analyses sufficient to meet the admissibility requirements by their extensive review of the record and systematic evaluation of "all potential causes of preterm labor."[46]

Delaware Rule of Evidence 702 governs the admissibility of expert testimony. Delaware has adopted the holdings in *Daubert v. Merrell Dow Pharmaceuticals Inc.*[47] and *Kumho Tire Co., Ltd. v. Carmichael*[48] to interpret the Delaware Rule.[49] In *Daubert* and *Kumho*, the United States Supreme Court interpreted and explained Federal Rule of Evidence 702, which is "substantially similar" to the Delaware Rule.[50] Delaware Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise, if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the witness has applied the principles and methods reliably to the facts of the case.[51]

---

[46] *Id.* ¶¶ 13-14.
[47] 509 U.S. 579 (1993).
[48] 526 U.S. 137 (1993).
[49] *Bowen v. E.I. DuPont de Nemours & Co., Inc.*, 906 A.2d 787, 794 (Del. 2006) (citing *M.G. Bancorporation, Inc. v. Le Beau*, 737 A.2d 513, 522 (Del. 1999)).
[50] *Smack-Dixon v. Walmart Inc.*, 2021 WL 3012056 (Del. Super. Ct. Jul. 16, 2021) (citing *Bowen*, 906 A.2d at 794).
[51] D.R.E. 702; *see also Smack-Dixon*, 2021 WL 3012056 (Del. Super. 2021).

14

To be admissible, expert testimony must be "relevant and reliable."[52] To make this determination, the trial judge engages in a five-step analysis.[53] This analysis provides that the trial judge finds that:

(1) the witness is qualified as an expert by knowledge, skill, experience, training, or education;
(2) the evidence is relevant;
(3) the expert's opinion is based on information reasonably relied upon by experts in the particular field;
(4) the expert testimony will assist the trier of fact to understand the evidence or to determine a fact in issue; and
(5) the expert testimony will not create unfair prejudice or confuse or mislead the jury.[54]

The burden of establishing that the expert testimony is admissible lies with its proponent by a preponderance of the evidence.[55] "A strong preference exists" for admitting expert opinions "when they will assist the trier of fact in understanding the relevant facts or the evidence."[56]

Reliable expert testimony is premised on scientific or specialized knowledge which requires the testimony to be grounded in scientific methods and procedures and "supported by appropriate validation – *i.e.*, 'good grounds,' based on what is known."[57]

---

[52] *Daubert*, 508 U.S. at 597.

[53] *Smack-Dixon*, 2021 WL 3012056 at *2 (citing *Bowen*, 906 A.2d at 795)).

[54] *Id.*

[55] *Id.*

[56] *Smack-Dixon*, 2021 WL 3012056 at * 2 (quoting *Delaware ex. Rel. French v. Card Compliant, LLC,* 2018 WL 4151288, *2 (Del. Super. Ct. Aug. 29, 2018) (quoting *Norman v. All About Women, P.A.*, 193 A.2d 726, 730 (Del. 2018)).

[57] *Daubert*, 509 U.S. at 590.

Many scientific, technical, or specialized fields are not subject to peer review and publication which is why the test of reliability is "flexible." A rigid application of the *Daubert* factors to determine testimonial reliability in every field of expertise is not practical.[58] Even with all the advances of medical science, the practice of medicine remains an art, and a diagnosis in the practice of clinical medicine "is not an exact science."[59]

Again, a gatekeeping judge has "broad latitude" to determine whether an expert's proffered opinion is based upon the "proper factual foundation and sound methodology."[60] This "proper factual foundation" language has been distilled from Delaware Rule 702.[61] To meet the criterion for a "proper factual foundation," an expert's opinion must be based on "facts" and not "suppositions."[62] When applied to a medical expert, a causation opinion is admissible when it's "based on his analysis of the circumstances . . . not mere speculation over the cause."[63] And a proponent need only show by a preponderance of the evidence that her expert's

---

[58] *Henlopen Hotel v. United Nat'l Ins. Co.*, 2020 WL 233333, at \*3 (Del. Super. May 11, 2022).

[59] *State v. McMullen*, 900 A.2d 105, 114 (Del. Super. Ct. 2006). *See also Moore v. Ashland Chem.*, 126 F.3d 679, 688-690 (5th Cir. 1997), *vacated on reh'g en banc*, 151 F.3d 269 (5th Cir. 1998) ("First, the goals of the disciplines of clinical medicine and hard Newtonian science are different. . . .Second, the subject matter and conditions of study are different. . . .Finally, clinical medicine and hard science have marked different methodologies. . . .In sum, hard Newtonian scientific knowledge. . .is knowledge of a particular and limited kind. . . . Although clinical medicine utilizes parts of some hard sciences, clinical medicine and many of its subsidiary fields are not hard sciences. . . . Consequently, the *Daubert* factors, which are hard scientific methods selected from the body of hard scientific knowledge and methodology generally are not appropriate for use in assessing the relevance and reliability of clinical medical testimony"). The Fifth Circuit's discussion of the significant differences between disciplines in "hard science" and clinical medicine still holds true even though the decision in that case was ultimately vacated. *Id.*

[60] *Russum v. IPM Dev. P'ship LLC*, 2015 WL 2438599, at \*2 (Del. Super. May 21, 2015).

[61] *Id.*

[62] *Id.* at 3.

[63] *Norman*, 193 A.2d at 732.

opinions are reliable, not that they are correct.[64] So, this Court's Rule 702 reliability examination must focus on principles and methodology not on the resultant conclusions.[65]

Delaware courts generally recognize that challenges to the "factual basis of an expert opinion go to the credibility of the testimony, not the admissibility, and it is for the opposing party to challenge. . . the expert opinion on cross-examination."[66] "The different depth with which [an expert] pursued particular lines of investigation and the different assumptions they made are readily subject to cross-examination and to evaluation by the fact finder for credibility and weight."[67] An expert's testimony will only be excluded in the narrow circumstance where he is shown to have completely neglected the core facts of the case.[68] And, under Delaware Rule 702, a medical doctor's opinion "based on his own knowledge" and informed by his review of a patient's records may certainly be sufficient to clear the *Daubert/Bowen* reliability threshold.[69]

---

[64] *McMullen*, 900 A.2d at 114 (citing *In Re: Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994)).

[65] *Henlopen Hotel*, 2020 WL 233333, at *2 ("At bottom, the Court's examination of an expert's opinion must be solely focused on principles and methodology, not on the conclusions they generate.") (quoting *Tumlinson v. Advanced Micro Devices*, 81 A.3d 1264, 1269 (Del. 2013)).

[66] *Perry v. Berkley*, 996 A.2d 1262, 1271 (Del. 2010). *See also Hodel v. Ikeda*, 2013 WL 226937, at *4 (Del. Super. Ct. Jan. 18, 2013); *Daubert*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." (internal citations omitted)); *Russum*, 2015 WL 2438599, at *3.

[67] *Henlopen Hotel*, 2020 WL 233333, at *4; *Perry v. Berkley*, 996 A.2d at 1271 (noting cross-examination rather than exclusion can be the proper method of exploring the bases of an expert's opinion and the weight to be ascribed thereto).

[68] *Russum*, 2015 WL 2438599, at *3.

[69] *See e.g.*, *Norman*, 193 A.3d at 731-32.

It is the Court's function to deem an expert's differential diagnosis method as a reliable means to form their ultimate opinion.[70] The courts have flexibility under Delaware law in making this decision.[71] It appears to the Court that Plaintiffs' experts utilize their personal knowledge and experience as well as medical literature to testify to their ultimate opinions concerning the placement of a cerclage preventing infection. The Court also finds that the experts have conducted differential diagnoses satisfactory to meet the needs of D.R.E. 702 and *Daubert*. Therefore, the Court finds no basis to exclude Plaintiffs' theory that a cerclage would have prevented Ms. Wright's ascending infection and leaves it to the jury to decide the issue.

For these reasons, the Court **DENIES** Defendants' Motion.

**IT IS SO ORDERED.**

*/s/ Francis J. Jones, Jr.*
Francis J. Jones, Jr., Judge

cc:     *File&ServeXpress*
        Donald L. Gouge, Esq.
        Brian M. Cathell, Esq.
        Colleen D. Shields, Esq.
        Randall S. MacTough, Esq.

---

[70] *State v. McMullen*, 900 A.2d 103, 117 (Del. Super. Ct. 2006).
[71] *Id.* at 118.