# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

VANESSA ANDINO, Individually )
and as the Administratrix of the Estate )
of **BRYAN MALDONADO-ANDINO** )     C.A. No.: N22C-10-671 FJJ
and the Estate of **JOVAN** )
**MALDONADO-ANDINO**; and )
**JOAQUIN MALDONADO**, )
                        )
        Plaintiffs, )
      v. )
                        )
**NEXIUS SOLUTIONS, INC.;** )
**MYNDCO, INC.; SUNBELT** )
**RENTALS, INC.,** )
                        )
        Defendants. )

Submitted: February 4, 2026
Decided: February 25, 2026

## OPINION AND ORDER
## ON DAUBERT MOTIONS AND MOTIONS FOR SUMMARY JUDGMENT

*Timothy E. Lengkeek, Esquire,* Young Conaway Stargatt and Taylor, LLP, Wilmington, Delaware, David L. Kwass, Esquire and Michael J. Zettlemoyer, Esquire (argued), Saltz Mongeluzzi Bendesky, *Attorney for Plaintiff.*

*Walter O'Brien, Esquire,* Weber Gallagher Simpson Stapleton Fires & Newby, LLP, Wilmington, Delaware, *Attorney for Defendant Nexius Insight, Inc.*

*R. Joseph Hrubiec, Esquire*, Post & Schell, P.C., Wilmington, Delaware, Attorney for Defendant *Myndco, Inc.*

*Joshua D. Scheets, Esquire*, Marshall Dennehey, P.C., Wilmington, Delaware, Attorney for *Sunbelt Rentals, Inc.*

**Jones, J.**

1

Plaintiffs, Vanessa Andino, on behalf of herself and as a representative of the Estates of both Bryan Maldonado-Andino and Jovan Maldonado-Andino ("Decedents"), and Joaquin Maldonado (collectively "Plaintiffs"), bring wrongful death claims against Nexius Solutions, Inc. ("Nexius"), Myndco, Inc. ("Myndco"), and Sunbelt Rentals, Inc. ("Sunbelt") (collectively "Defendants"). On November 2, 2020, Decedents went up in an aerial lift to work on a cell phone tower in Bethany Beach, Delaware, when the lift was blown over allegedly due to high winds, tragically killing the two men. At the time of the November 2, 2020 accident, Decedents were employed by Velex, Inc. ("Velex"). Each of the three defendants named above has moved for Summary Judgment. In addition, *Daubert* Motions have been filed challenging the testimony of Plaintiffs' liability expert Anthony Lusi and Plaintiffs' damage expert Wayne Ross, M.D. This is the Court's decision on the summary judgment motions of Nexius and Myndco and the *Daubert* challenge as to Dr. Ross.[1]

**FACTS**

When viewed in a light most favorable to the Plaintiffs, the following factual record is revealed.

---

[1] The Summary Judgment Motion of Sunbelt and the *Daubert* challenge as to Anthony Lusi remain pending as supplemental briefing is occurring.

Nexius is the head of a family of entities at issue in this case.[2] Velex, Inc. ("Velex") is one of the corporations falling under the Nexius umbrella.[3] Originally entitled "Nexius Fusion," Velex underwent a name change around 2016.[4] Velex is a subcontractor of Nexius who performed field work.[5] Myndco, another entity in the family, was created by Nexius as "the training arm of the Infiniux group of families – of companies."[6] Sunbelt is an equipment rental company not part of the Nexius family of entities. Nexius and Sunbelt had a Partnership Agreement in place since at least 2015, and this is where Nexius rented the arial lift / ultraboom / mobile elevated work platform ("MEWP") at issue in the present case.[7]

Despite being separate entities, Nexius still exerted influence over the other entities in the "family of companies."[8] As one Nexius vice president put it, "there's so much like overlap and influence between Nexius and Velex and Myndco because it's all part of the same umbrella."[9] David Hall, the Senior Director of Safety for Nexius at the time of the incident, stated "[Nexius] oversaw safety for Velex operations."[10] For example, Nexius created and implemented the customized Job Safety Analysis ("JSA") forms used on each Velex jobsite.[11] The JSA was utilized

[2] Docket Item ("D.I.") 280, at 3.
[3] *Id.* at 4.
[4] *Id.* at 3.
[5] D.I. 258, at 6, 8.
[6] D.I. 280, at 3; D.I. 278, at 2.
[7] D.I. 280, at 2.
[8] D.I. 280, at 3.
[9] D.I. 280, at 4.
[10] D.I. 280, at 3.
[11] D.I. 280, at 12.

"[t]o identify the scope, identify any hazards, and then what controls would be implemented to control those hazards."[12] Furthermore, Nexius could also determine which safety officials would be used at a given jobsite,[13] and performed safety audits.[14] Nexius employees also had the ability to shutdown Velex jobsites when they deemed it appropriate.[15]

Turning to Myndco, as the training arm of Nexius all the new-hire employee training was to take place through Myndco.[16] However, Nexius still retained "oversight of curriculum development and oversight of training delivery."[17] Myndco also could not change the training program curricula without Nexius' approval.[18]

As a Nexius subcontractor, Velex entered into a Master Construction Subcontracting Agreement ("Velex Agreement") with Nexius in December of 2016. This agreement laid out the following: 1) "[s]ubcontractor is solely responsible for maintaining safe working conditions for Subcontractor's employees and for protecting persons and property;"[19] 2) Velex is responsible for all staffing and supervision requirements;[20] 3) Velex shall ensure all those working on-site shall have

---

[12] D.I. 280, at 12.
[13] *See* D.I. 253, at 11; s*ee also* D.I. 280, at 6.
[14] D.I. 280, at 6, 7.
[15] D.I. 280, at 11.
[16] D.I. 258, at 11.
[17] D.I. 280, at 5-6.
[18] D.I. 255, at 5.
[19] D.I. 280, at 6.
[20] *Id.* at 6-7.

the required certifications;[21] 4) Velex will follow all safety regulations while working on-site;[22] 5) Velex is responsible for the hiring, disciplining, and firing of their employees;[23] 6) Nexius was not required to exercise any control over Velex or its employees, and any decision issued by Nexius did not confer any responsibility to them for the ensuing actions taken by Velex;[24] 7) Nexius has no control over any employee of Velex;[25] and 8) Velex is solely responsible for the action and omissions of its employees in the scope of their employment.[26] As such, Velex determined what crews were sent to which worksites.[27] However, Nexius still "oversaw safety for Velex operations"[28] and were kept apprised of which workers were at which worksites.[29]

In January of 2019, Nexius entered into a Master Agreement with T-Mobile USA, Inc. ("T-Mobile") to work on some of their telephone towers.[30] As the general contractor, Nexius held the contract while Velex completed the work as the subcontractor.[31] The T-Mobile Agreement required Nexius to: 1) be responsible for maintaining and supervising all safety precautions in connection with the work; and

---

[21] *Id.* at 7.
[22] *Id.* at 7.
[23] *Id.* at 7.
[24] *Id.* at 7-8.
[25] *Id.* at 8.
[26] *Id.* at 8.
[27] D.I. 258, at 8.
[28] D.I. 280, at 5.
[29] D.I. 280, at 10-11.
[30] D.I. 280, at 8; D.I. 258, at 8.
[31] D.I. 258, at 8.

2) examine the worksites and local conditions, specifically for uncertain weather and other physical conditions.[32]

To complete their work, Nexius regularly rented MEWPs from companies such as Sunbelt.[33] Nexius' Partnership Agreement with Sunbelt provided that Nexius would ensure that only properly trained and certified individuals would use the Sunbelt equipment.[34] This was further confirmed in the rental agreement of the MEWP at issue.[35]

Decedents were hired to work for Velex on October 19, 2020.[36] As the appointed "entity to train Velex,"[37] the Decedents "received training from Myndco, including OSHA 10, Bloodborne Pathogens Awareness, Competent Climber & Rescuer, Competent Rigger, and RF Awareness trainings and certifications."[38] Myndco provided the "classroom/theoretical" training for use of the MEWP at issue but not the hands-on training.[39] Sunbelt's District Safety Trainer, Kevin Dominguez, stated that the certified MEWP training would have addressed "unsafe maneuvers, unsafe -- unsafe wind speeds, unsafe hazards that could cause incidents or obviously catastrophic events."[40] Decedents then began working for Velex without having

---

[32] D.I. 280, at 9.
[33] D.I. 253, at 6.
[34] D.I. 253, at 6.
[35] D.I. 253, at 6; D.I. 280, at 10.
[36] D.I. 280, at 2.
[37] D.I. 278, at 2.
[38] D.I. 255, at 6.
[39] D.I. 255, at 6. Myndco asserts that the second half of the training, the hands-on half, was supposed to be completed by Velex due to the company's Covid-19 restrictions.
[40] D.I. 278, at 3.

completed their aerial lift / MEWP training.[41]  However, Jason Alves, the Nexius market manager,[42] was not aware of any circumstance in which Myndco would release personnel into the field without completing their MEWP training and certification.[43]

On October 24, 2020, Decedents were assigned to and began working at the Sussex Water Company water tower cell antennae in Bethany Beach.[44] Nexius made the decision not to employ a field construction manager at the Bethany Beach jobsite and instead utilized a field service manager.[45] A field construction manager is an on-site employee in charge of safety, while a field service manager had the same duties but worked remotely.[46] After some issues with the original lift, Nexius rented a second MEWP from Sunbelt for the crew to use at the Sussex water tower jobsite on October 30, 2020.[47] However, no work was completed on October 30 due to rainy and windy conditions;[48] this was not an abnormal occurrence.[49]

On November 1, 2020, the National Weather service in Mount Holly issued a wind advisory for the Delaware beaches that was in effect until 7 PM on November 2.[50] On November 2, 2020, Alan Frazier, the Associate vice president of Nexius,

[41] D.I. 255, at 6-7; D.I. 278, at 4; D.I. 253, at 3-4; D.I. 279, at 2. As such, they were not certified to operate the MEWP.
[42] D.I. 253, at 12.
[43] D.I. 278, at 8, 9.
[44] D.I. 253, at 5.
[45] D.I. 253, at 11.
[46] D.I. 253, at 11.
[47] D.I. 253, at 6; *see also* D.I. 280, at 7 (noting that "Nexius was responsible for the lift from the time it was dropped off until the time it was picked up by the rental company.")
[48] D.I. 253, at 6; D.I. 258, at 9.
[49] D.I. 253, at 7, 11.
[50] D.I. 253, at 8.

shut down the Baltimore-Washington market, the New York market and the New England market due to high winds.[51] However, the New Jersey market, which included the Bethany Beach site, was not shut down by Mr. Frazier because he believed Velex knew not to operate given the high winds.[52] Velex, Nexius, or Myndco could have made a call to shut down the job site.[53] It was their internal policy to not use an aerial lift if the winds exceeded 20mph.[54]

On the morning of November 2, 2020, the wind advisory was updated at 3:52 AM indicating sustained winds would be around 25-35 mph, with gusts reaching up to 50 mph.[55] The manual for the specific MEWP in use at the jobsite, a Genie Z-135/70 articulating boom lift,[56] indicates the maximum wind threshold for the lift is 28mph.[57] However, Decedents, who were not certified to use the MEWP, began operating the lift at the Bethany Beach jobsite.[58] Around 10:30 AM, the lift tipped over, killing Decedents.[59] At the time of the accident, wind gusts ranged from 35-44 mph at the incident location.[60] Multiple witnesses testified as to the high winds

---

[51] *Id.* at 12.
[52] *Id.* at 12.
[53] *Id.* at 12; *see also* D. I. 280, at 6-7, 11 (highlighting a Nexius Regional Senior Safety Specialist assigned to the Baltimore-Washington market, in addition to Mr. Frazier, retained the authority to shut down jobsites); *see also* D.I. 278, at 2 (acknowledging Myndco was responsible for issuing safety stand-downs and releasing crews back to work); *see also* D.I. 258, at 13 (noting Velex could override any Nexius decision and they could shut down a jobsite if needed).
[54] *Id.* at 12.
[55] D.I. 253, at 7-8.
[56] D.I. 280, at 2.
[57] D.I. 253, at 8.
[58] D.I. 253, at 7-8.
[59] D.I. 253, at 8.
[60] D.I. 253, at 8.

that day and the trouble it caused in their daily routines.[61]  After the accident, Nexius placed all Northeast Region work, and eventually all Velex crews nationwide, in a safety shutdown.[62]  The federal Occupational Safety and Health Administration (OSHA) investigated the incident, and on April 30, 2021, OSHA cited Velex for three Serious Violations as a result.[63]

### *DAUBERT* MOTION AS TO DR. WAYNE ROSS

Plaintiffs have offered Wayne Ross, M.D. ("Ross"), as an expert on conscious pain and suffering.  Defendant Myndco has moved to exclude his testimony regarding Decedents' pain and suffering in the accident under Daubert.  They assert Dr. Ross is speculating that Decedents maintained consciousness and as to the duration of that consciousness.  Plaintiffs respond that Dr. Ross' extensive background, reliance on accepted scientific methodology and application of those methodologies to the facts of this case support the admission of his testimony.

Delaware Rule of Evidence "702 governs the admissibility of expert opinion testimony."[64]  The Delaware Rule is consistent with the Federal Rule of Evidence 702, and Delaware has adopted the holdings in both *Daubert v. Merrell Dow Pharmaceuticals Inc.* and *Kumho Tire Co., Ltd. v. Carmichael*.[65]  "The party seeking

---

[61] D.I. 253, at 8-10.

[62] D.I. 280, at 11.

[63] D.I. 258, at 10; *see also* Ex. H.

[64] *In re Zantac (Ranitidine) Litig.*, 342 A.3d 1131, 1143 (Del. 2025).

[65] *Brown v. Fisher-Price, Inc.*, 336 A.3d 139, 145 (Del. Super. Ct. 2025) (citing *Bowen v. E.I. DuPont de Nemours & Co.*, 906 A.2d 787, 794 (Del. 2006)); *see also In re Zantac (Ranitidine) Litig.*, 342 A.3d 1131, 1144 (Del. 2025).

to introduce the expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence."[66] "To be admissible, expert testimony must be 'relevant and reliable.'"[67] The Delaware Supreme Court has summarized a trial judge's considerations in making this determination:

> Consistent with *Daubert*, we apply a five-step test to determine the admissibility of scientific or technical expert testimony. The trial judge must determine whether:
> (1) the witness is qualified as an expert by knowledge, skill experience, training or education;
> (2) the evidence is relevant;
> (3) the expert's opinion is based upon information reasonably relied upon by experts in the particular field;
> (4) the expert testimony will assist the trier of fact to understand the evidence or to determine a fact in issue; and
> (5) the expert testimony will not create unfair prejudice or confuse or mislead the jury.[68]

"The inquiry is a flexible one."[69] While "[a] strong preference exists for admitting expert opinions when they will assist the trier of fact in understanding the relevant facts or the evidence,"[70] it is important to remember this Court acts as a gatekeeper.[71]

"Delaware law allows recovery for conscious pain and suffering experienced between the time of injury and death."[72] "[U]nder the Survival Statute[,] conscious

---

[66] *Bowen v. E.I. DuPont de Nemours & Co.*, 906 A.2d 787, 795 (Del. 2006) (citing *Minner v. Am. Mortgage & Guar. Co.*, 791 A.2d 826, 843 (Del. Super. Ct. 2000)).

[67] *Brown*, 336 A.3d at 146 (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)).

[68] *Bowen*, 906 A.2d at 795 (citing *Tolson v. State*, 900 A.2d 639, 645 (Del. 2006)).

[69] *In re Zantac*, 342 A.3d at 1144 (quoting *Daubert v. Merrell Dow Pharms.*, Inc., 509 U.S. 579, 594 (1993)) (internal quotations omitted).

[70] *Brown*, 336 A.3d at 146 (citing *Smack-Dixon v. Wal-Mart, Inc.*, 2021 WL 3012056, at *2 (Del. Super. Ct. July 16, 2021)) (internal quotations omitted).

[71] *In re Zantac*, 342 A.3d at 1135; *see also Brown v. Fisher-Price, Inc.*, 2024 WL 5199952, at *1 (Del. Super. Ct. Dec. 20, 2024) ("[T]his Court acts as gatekeeper, determining if 'the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology properly can be applied to the facts in issue.'").

[72] *Truitt v. Winder*, 2025 WL 3487494, at *13 (Del. Super. Ct. Dec. 4, 2025)

pain and suffering from the time of injury until death is a proper element of recovery … provided that the plaintiff proves by a preponderance of the evidence that the decedent did not die instantaneously upon impact and that there was some appreciable interval" of pain and suffering consciously experienced by the Decedent after the injury occurred.[73]  "Expert testimony plays a critical role in determining whether conscious pain and suffering occurred."[74] "The validity of an expert's conclusions remains a question for the jury provided the expert utilized a reliable methodology."[75]  In *Estate of Alberta Rae v. Murphy*, this Court denied a Motion for Summary Judgment on the issue of conscious pain and suffering, holding that a jury should resolve the dispute when two "appropriately qualified" experts disagreed as to a decedents conscious pain and suffering.[76]

The Court is satisfied as to the proffered expert's qualifications.  Dr. Ross is a board-certified forensic pathologist, neuropathologist, and medical examiner with over 40 years of experience who has completed more than 14,800 autopsies.  He has served as a forensic pathologist and medical examiner for multiple Pennsylvania counties and has held numerous academic positions.  This Court has also previously

---

[73] *Magee v. Rose*, 405 A.2d 143, 146 (Del. Super. Ct. 1979) (citing *Turcol v. Jenkins*, 49 Del. 596, 598, 122 A.2d 224 (Del. Super. Ct. 1956)) (internal citation omitted).
[74] *Truitt*, 2025 WL 3487494, at *13.
[75] *Brown v. Fisher-Price, Inc.*, 2024 WL 5199952, at *4 (Del. Super. Ct. Dec. 20, 2024).
[76] *Est. of Alberta Rae v. Murphy*, 2006 WL 1067277, at *5 (Del. Super. Ct. Apr. 19, 2006), *aff'd sub nom. Est. of Rae v. Murphy*, 956 A.2d 1266 (Del. 2008).

found Dr. Ross' qualifications meet the Delaware standard to testify as an expert on this issue.[77]

As to the reliability of his findings, the Court is again satisfied that Dr. Ross has utilized accepted methodologies to reach his conclusions. As the exhibits indicate, he has relied upon 1) his 40 years of experience in the field; 2) the autopsy findings of Decedents; 3) other records from the present case indicating the facts of the incident; and 4) an extensive review of medical and scientific literature. His reports show he applied the Glasgow Coma Score framework and articles published in the field of cognitive brain research. Additionally, this Court has also previously found Dr. Ross' testimony as to conscious pain and suffering determinations to be the product of sufficiently reliable methodology.[78] For these reasons, the Court is satisfied that Dr. Ross' findings are grounded in reliable scientific methods.

Accordingly, the Daubert Motion to Exclude Dr. Ross' testimony is **DENIED**.

## SUMMARY JUDGMENT MOTIONS
## STANDARD OF REVIEW

Superior Court Civil Rule 56(c) states a party seeking summary judgment must show "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[79] "A genuine issue of material

---

[77] *Brown v. Fisher-Price, Inc.*, 2024 WL 5199952, at *4-5 (Del. Super. Ct. Dec. 20, 2024).
[78] *Id.*
[79] Del. Super. Ct. Civ. R. 56(c).

12

fact is one that 'may reasonably be resolved in favor of either party.'"[80]  The court

views the evidence provided "in a light most favorable to the non-moving party."[81]

The initial burden is on the moving party to show there are no genuine issues of

material fact.[82]  The burden then shifts to the non-moving party to show there is at

least one material issue of fact in dispute.[83]  The court must consider "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with

affidavits, if any," in determining whether there is a genuine issue as to any material

fact,[84] and the court must "accept all undisputed factual assertions and accept the

nonmoving party's version of any disputed facts."[85]  However, any factual inferences

made in favor of the non-moving party must be reasonable.[86]

## THE NEXIUS SUMMARY JUDGMENT MOTION

Defendant Nexius has moved for summary judgment as to the allegations

against it.[87]  Nexius maintains that as the general contractor, it owed no duty to the

employees of Velex, an independent contractor.[88]  Specifically, Nexius argues

"Delaware law provides that a general contractor does not have a duty to protect an

---

[80] *Saunders v. Lightwave Logic, Inc.*, 2024 WL 4512227, at *6 (Del. Super. Ct. Oct. 17, 2024) (quoting *Moore v. Sizemore*, 405 A.2d 679, 680–81 (Del. 1979)).
[81] *Gibson v. Metro. Grp. Prop. And Cas. Ins. Co.*, 2017 WL 5606714, at *2 (Del. Super. Ct. Nov. 15, 2017) (citing *Burkhart v. Davies*, 602 A.2d 56, 59 (Del. 1991)).
[82] *Id.*
[83] *Id.*
[84] *Coker v. Tenney-Andrews*, 2016 WL 6659500, at *2 (Del. Super. Ct. Nov. 10, 2016) (quoting Del. Super. Ct. Civ. R. 56(c)).
[85] *Id.* (quoting *Sztybel v. Walgreen Co.*, 2011 WL 2623930, at *2 (Del. Super. Ct. June 29, 2011)).
[86] *Smith v. Haldeman*, 2012 WL 3611895, at *1 (Del. Super. Ct. Aug. 21, 2012) (citing *Mergenthaler v. Asbestos Corp. Of America, Inc.*, 1988 WL 16284, at *5 (Del. Super. Ct. July 13, 1988).
[87] D.I. 258.
[88] D.I. 258, at 15.

independent contractor's employees from the hazards of completing the contract."[89] Nexius recognizes that three exceptions to this rule exist: 1) "if the general contractor actively controls the manner and method of performing the contract work;"[90] 2) "if the general contractor voluntarily undertakes responsibility for implementing safety measures;"[91] and 3) "if the general contractor retains possessory control over the premises during the work."[92] Nexius asserts none of these exceptions apply to the instant case.

Plaintiffs respond that summary judgment should be denied as they have raised multiple issues of disputed fact: 1) Nexius actively controlled the method and manner of work being completed at the jobsite; 2) Nexius voluntarily assumed responsibility for safety; 3) the safety measures Nexius implemented were deficient and was a proximate cause of the harm to Decedents; 4) Nexius had independent duties as the MEWP "user" under the rental agreement and ANSI standards; and 5) expert testimony supports Nexius' liability.[93]

The question of whether Nexius owed a duty to Decedents is the central issue in Nexius' motion. Specifically, the issue is whether Plaintiffs can demonstrate facts that fit within the exception to the general rule.

I.    There is a Genuine Factual Dispute of Whether Nexius Had Active Control Over the Velex Jobsite

---

[89] *Id.* at 15 (citing *Handler Corp. v. Tlapechco*, 901 A.2d 737, 743 (Del. 2006)).
[90] *Id.* at 15-16 (citing *Williams v. Cantera*, 274 A.2d 698, 700 (Del. Super. Ct. 1971)).
[91] *Id.* at 16-17 (citing *Figgs v. Bellevue Holding Co.*, 652 A.2d 1084, 1092 (Del. Super. Ct. 1994)).
[92] *Id.* at 17 (citing *Bryant v. Delmarva Power & Light Co.*, 1995 WL 653987, at *8-9 (Del. Super. Ct. Oct. 2, 1995)).
[93] D.I. 280, at 13-14.

A general contractor owes a duty to protect an independent contractor's employees where the general contractor actively controls the manner and method of the work performed. "[W]hile the concept of active control is an elastic one, it is not inferred from mere retention by the owner or contractor of the right to inspect or to supervise the work for conformity with the contract."[94] Instead, "active control" refers to the right to control the "manner or methods used by the independent contractor."[95] "[I]f the authority exerted by the owner over the work is insufficient to render it liable under the general rule regarding active control," the owner could still be found liable "'if it retained sufficient control over part of the work or if it retained possessory control over the work premises during the work.'"[96] "In deciding defendant's summary judgment motion, the contractual agreements entered into between the parties represent additional relevant evidence regarding the existence of a duty owed to plaintiff."[97]

In *Cook v. E.I. DuPont de Nemours and Co.*, the Superior Court found that DuPont "sufficiently 'interjected itself'" into the day-to-day operations of their independent contractor for the following reasons:

---

[94] *Kilgore v. R.J. Kroener, Inc.*, 2002 WL 480944, at *6 (Del. Super. Ct. Mar. 14, 2002) (citing *Seeney v. Dover Country Club Apartments, Inc.*, 318 A.2d 619, 621 (Del. Super. Ct. 1974)); *see also Cook v. E.I. DuPont de Nemours & Co.*, 2001 WL 1482685, at *2 (Del. Super. Ct. Aug. 20, 2001).

[95] *Kilgore*, 2002 WL 480944, at *6 (citing *Seeney v. Dover Country Club Apartments, Inc.*, 318 A.2d 619, 621 (Del. Super. Ct. 1974)).

[96] *Cook v. E.I. DuPont de Nemours & Co.*, 2001 WL 1482685, at *2 (Del. Super. Ct. Aug. 20, 2001) (quoting *Bryant v. Delmarva Power & Light Co.*, 1995 WL 653987, at *8 (Del. Super. Ct. Oct. 2, 1995)).

[97] *Id.* at *3.

> First, there was a DuPont supervisor present at the construction site on a daily basis. Second, there was a DuPont supervisor engaged in communication with BCCI on a daily basis. Third, DuPont supplied tools to BCCI, at least on one occasion. Fourth, DuPont actively controlled, directed, and restricted the movements of the BCCI employees, including plaintiff. Fifth, DuPont inspected BCCI's offices and vehicles, and retained the ability to search the premises in case of a problem.[98]

As a result, the *Cook* court denied the defendant's motion for summary judgment. Conversely, in *Kilgore v. R.J. Kroener, Inc.*, the Superior Court granted the defendant's motion for summary judgment, in part, because "the scaffolding from which Kilgore fell was neither owned nor constructed by [the defendant]."[99]

The facts of the present case are similar to those in *Cook*. As to the first two highlighted facts provided by the *Cook* court, Nexius had input as to what safety supervisors were or were not present at the Bethany Beach Velex jobsite. Although they could have had an on-site supervisor present, Nexius instead made the choice to employ a remote field service manager. Next, a key fact for both the *Cook* court and the *Kilgore* court was who had control over the equipment on the jobsite. Here, Decedents' accident involved a MEWP leased by Nexius, the second such MEWP Nexius provided to that jobsite. Finally, as to the last two reasons provided in *Cook*, Nexius exercised control over the Bethany Beach Velex employees through their ability to shut down work at the site and by providing the JSA. On the morning of

---

[98] *Id.* at *4.
[99] *Kilgore*, 2002 WL 480944, at *6.

the accident, Nexius shut down other east coast markets due to high wind. After the accident, Nexius put all Velex jobsites nationwide in a safety shutdown. Furthermore, Nexius created JSAs tailored to each Velex jobsite which highlighted the safety issue of that area, and what controls are in place to deal with them.

Viewing these facts in a light most favorable to Plaintiffs, there is a genuine factual dispute over whether Nexius exercised active control over the Velex jobsite. Accordingly, the Motion for Summary Judgment is DENIED on this basis.

II.  There is a Genuine Factual Dispute of Whether Nexius Voluntarily Assumed Responsibility for Safety

The second exception to the general rule occurs when a general contractor "voluntarily undertakes the responsibility for implementing safety measures" at the jobsite.[100] The Delaware Supreme Court has clarified that "if [Defendant] assumed any responsibility for subcontractor employee safety, it had an obligation to fulfill that duty with care."[101] Thus, Defendant does not need to take sole responsibility for jobsite safety; taking even "some responsibility for workplace safety" is enough to leave a defendant open to liability if that duty is not carried out reasonably.[102] "A duty to ensure such safety can be imposed upon a party who 'by agreement or

---

[100] *Handler Corp. v. Tlapechco*, 901 A.2d 737, 743 (Del. 2006) (citing *Figgs v. Bellevue Holding Co.*, 652 A.2d 1084, 1092 (Del. Super. Ct. 1994)).

[101] *Id.* at 747; *see also Harford Mut. Ins. Co. v. Weiner*, 2014 WL 4247724, at *4 (Del. Super. Ct. July 15, 2014).

[102] *Id.*

otherwise undertakes responsibility for implementing the required safety measures.'"[103]

In *Urena v. Capano Homes, Inc.*, the Court's analysis considered both the language of the contract between the general and independent contractors, and the actions taken by the general contractor to determine if there was an assumption of safety duties. First, the *Urena* Court noted the contract between the two parties placed the assumption of responsibility for safety on the independent contractor.[104] Second, the Court found "[t]he conduct of [the general contractor] … does not suggest that [the general contractor] accepted any responsibility for the conduct of the workers of an independent contractor."[105]

The *Urena* Court recognized language in *Bryant v. Delmarva Power & Light Co.* to reach this conclusion: "property owner does not voluntarily assume responsibility for workplace safety by advising his independent contractor of observed safety violations where the independent contractor is contractually required to maintain workplace safety."[106] Thus, when the general contractor "observed unsafe roofing practices" and only reported it to the independent contractor's supervisor rather than the individual workers directly, the *Urena* Court

---

[103] *Urena v. Capano Homes, Inc.*, 901 A.2d 145, 153 (Del. Super. Ct. 2006), *aff'd*, 930 A.2d 877 (Del. 2007) (quoting *Figgs v. Bellevue Holding Co.*, 652 A.2d 1084, 1092 (Del. Super. Ct.1994)).
[104] *Id.*
[105] *Id.*

[106] *Id.* (quoting *Bryant v. Delmarva Power & Light Co.*, 1995 WL 653987, at *11 (Del. Super. Ct. Oct. 2, 1995))

held the "conduct [was] inconsistent with voluntary assumption of responsibility of safety."[107] The idea that merely observing and reporting safety violations is not enough to assume safety responsibilities extends beyond just *Urena* and *Bryant*.[108]

Similar to the first exception, performing safety inspections for the purpose of ensuring contract compliance is not enough to reach the threshold of assuming responsibility for safety.[109] The same can be said for retaining shut down power.[110] A lack the of general contractor's employees or representatives presence on a jobsite at the time of injury can also be considered.[111] In *Cooke v. Seaside Exteriors*, the Court stated the necessary consideration is whether "there is [a] causal relationship in what the general contractor did as far as safety suggestions and the reasons for Plaintiff's injury."[112]

Given the facts of this case, there is a genuine dispute as to whether Nexius voluntarily assumed responsibility for safety of the jobsite. In first looking at the contract, the language is clear Velex is responsible for the safe working conditions of the jobsite. However, a question arises when looking at the conduct of Nexius. To begin, Nexius created and implemented the customized JSAs for each jobsite which were used "[t]o identify the scope, identify any hazards, and then what

---

[107] *Id.*
[108] *Rafferty v. Century Eng'g, Inc. Int'l*, 2002 WL 480958, at *8 (Del. Super. Ct. Mar. 22, 2002); *see also Cooke v. Seaside Exteriors*, 2006 WL 3308206, at *4 (Del. Super. Ct. Nov. 10, 2006).
[109] *Id.* at *8.
[110] *Id.* at *8-9.
[111] *Cooke v. Seaside Exteriors*, 2006 WL 3308206, at *4 (Del. Super. Ct. Nov. 10, 2006).
[112] *Id.*

controls would be implemented to control those hazards." Nexius also decided to employ only a remote safety officer for the Bethany Beach jobsite as opposed to an on-site one. Further, Nexius employees had shut down authority and could conduct safety audits on Velex jobsites. Finally, David Hall, the Senior Director of Safety for Nexius, stated "[Nexius] oversaw safety for Velex operations." While each of these facts alone may not create liability, in the aggregate there is a genuine dispute as to whether Nexius voluntarily assumed safety responsibilities for the jobsite that a trier of fact must decide.[113]

Accordingly, the Motion for Summary Judgment is **DENIED** on this basis as well.

## THE MYNDCO MOTION

Myndco has also filed a Motion for Summary Judgment. Like Nexius, Myndco argues that they owed no duty to Decedents. Specifically, they contend Myndco had no oversight duties relating to the work, the worksite, or the safety therein, and they had no duty to ensure the Decedents were fully trained and certified to operate the MEWP. Plaintiffs respond that Myndco, as the training arm of the Infiniux group of entities, had a duty of care to ensure Decedents received their full training and any delegation of that training was negligent.[114]

---

[113] Plaintiffs have conceded that they are not relying on the possessory control over the premises during work exception.

[114] Plaintiffs conceded at oral argument that they were not making claims regarding oversite of the work, worksite, or safety. The claims versus Myndco are limited to the training allegations.

20

In the instant case, the record is replete with evidence that Myndco was the designated training arm of the group of entities at issue. David Hall, the senior director of safety at the time of the accident, noted that Myndco was established as a separate entity to train all new-hire personnel. Mr. Frazier also testified that Myndco was "responsible in the Infiniux family to provide the aerial lift certification training." Not only that, but Decedents in this case received their initial onboarding training from Myndco, including "OSHA 10, Bloodborne Pathogens Awareness, Competent Climber & Rescuer, Competent Rigger, and RF Awareness trainings and certifications" and the classroom/theatrical part of the aerial lift training. Because this accident involved an aerial lift, there is a foreseeable risk of harm created by a potential breach of Myndco's duty to train Nexius personnel.

Defendant Myndco essentially claims that they had no duty to fully train Decedents or ensure Decedents completed their training because it was not their responsibility to finish the last part of the MEWP training. Instead, they assert that Velex was in charge of the hands-on aerial lift training due to Covid restrictions at the time - a fact disputed by Plaintiffs. Even if it was true that it was not Myndco's responsibility to complete the second half of the aerial lift training, that does not relieve Myndco from their duty of reasonable care in carrying out the training as the sole purpose of Myndco's existence was to train Nexius personnel.

Having undertaken the duty to train Decedents, Myndco had a duty to ensure that decedents were properly and completely trained. There are issues of fact which preclude summary judgment. Those issues of fact include but are not limited to: 1) whether the in-class training was adequate; 2) whether the in-class and hands on training was actually bifurcated and, if so, whether the decision to bifurcate the training was reasonable; and 3) whether it was reasonable for Myndco to rely on Velex to complete the training under the circumstances of this case. In short, Myndco had a duty and whether it breached that duty is an issue that must be determined by a trier of fact.

Accordingly, the Motion for Summary Judgment as to Plaintiffs' negligence claims against Myndco is **DENIED**.[115]

## CONTRIBUTORY RECKLESSNESS AND WANTONNESS[116]

In the written submissions only Sunbelt raised the Defense of Contributory Recklessness. At oral argument Nexius and Myndco indicated that they were also relying on this defense. In short, Contributory Recklessness is an issue of fact and given the facts of this case, the issue will be left to the jury.

"Contributory wantonness exists when a plaintiff, with no intent to cause harm, performs an act which is so unreasonable and dangerous that he either knows

---

[115] Myndco also moved for summary judgment on the punitive damages issue. Plaintiffs conceded at oral argument that all claims for punitive damages were not being pursued and the Court granted summary judgment on the punitive damages claims at oral argument.

[116] Contributory Recklessness and Contributory Wantonness are the same thing.

or should know that there is an eminent likelihood of harm which can result."[117] "Stated differently, '[a] plaintiff who engages in some overt act that recklessly exposes himself to a known danger is guilty of contributory wantonness.'"[118] "Under Delaware common law, contributory recklessness operates as a complete bar to recovery for negligence."[119] Contributory recklessness is a fact-based determination typically reserved for the jury.[120] This decision should only be taken away from the trier of fact when, "on the stipulated facts, Decedent's conduct was so egregious that it constitutes recklessness as a matter of law, and no reasonable juror could find otherwise."[121] The Court is not prepared to say that Decedents actions constituted contributory recklessness as a matter of law. That is a question for the jury. As there are questions of fact regarding whether defendants conduct arises to contributory recklessness, summary judgment is **DENIED**.

      **IT IS SO ORDERED.**

                                     */s/ Francis J. Jones, Jr.*
                                    Francis J. Jones, Jr., Judge

cc:    File & ServeXpress

---

[117] *Staats by Staats v. Lawrence*, 576 A.2d 663, 667-68 (Del. Super. Ct. 1990), *aff'd*, 582 A.2d 936 (Del. 1990) (citing *Gushen v. Penn Cent. Transp. Co.*, 280 A.2d 708, 710 (Del. 1971)).
[118] *Northan v. Thomas*, 2024 WL 2974271, at *3 (Del. Super. Ct. June 12, 2024), *aff'd*, 339 A.3d 1226 (Del. 2025) (quoting *Staats by Staats v. Lawrence*, 576 A.2d 663, 668 (Del. Super. Ct. 1990), *aff'd*, 582 A.2d 936 (Del. 1990)).
[119] *Id.* (citing *Staats*, 576 A.2d 663.)
[120] *Id.* at *2.
[121] *Id.*